at all, or arguments not to exceed 15 minutes per side. Mr. Mark R. Brown, for the appellants. Good afternoon, Mr. Brown and Mr. Hendershot. Before we begin, I do want to assure you that the panel is prepared for the case today. We just have the one case on our docket. We have read your briefs, and because we are prepared, we would prefer it if you'd please spend your time arguing the most critical issues in the case. We will assume that arguments that are not made today, that you rely upon the arguments contained in your brief. And Mr. Brown, as Spider said, you have reserved three minutes for rebuttal. Is that correct? Yes, Your Honor. All right, you may begin. Thank you, Your Honor. Good afternoon, and may it please the court. My name, of course, is Mark Brown. I represent the Libertarian Party and Harold Thomas. We are the appellants in this case. I will not spend time on the facts. I know the court is familiar with the facts. But just a brief introduction, I think, is in order, Your Honor, to kind of set the stage for this case. I, of course, represent the Libertarian Party. By definition, the party, the Libertarian Party, is a political party, and its objective, its ideal, if you will, is to influence policy, to make policy in the state of Ohio. In order to achieve that goal, it must, as is true in any republic, it must elect candidates, or at least it must attempt to elect candidates. So that is its premier objective. In order to achieve that objective, Your Honor, to fairly achieve that objective, the Libertarian Party is entitled to a level playing field. And that's what this case is all about, Your Honor, a level playing field, nothing more, nothing less. As it stands, Ohio has created a quite unlevel, unfair playing field. Historically, Ohio, Your Honor, I've been involved in election litigation for some time and researched for some time. Historically, Ohio is one of the poster children, if you will, for bad politics, for keeping minor parties off the ballot, at least since 1948. Well, Mr. Brown, if I may, that obviously is not a concern here, right, keeping you guys off the ballot. This law doesn't do that. And I just want to make sure I understand your argument. So your argument is that, is not that this body is going to make decisions unfair to the Libertarian Party. As I understand it, your argument instead is that the Libertarian Party is going to have a harder time attracting supporters because they are not going to have the opportunity to serve on this body. Is that a fair assessment of how this nets out practically in your view? Fair by half, Your Honor. Fair by half. Of course, with the Ohio law that prohibits, absolutely prohibits Libertarians from serving on the Ohio Elections Commission, that is going to make a difference. But Mr. Brown, the statute does not prohibit Libertarians from serving. It just limits service to the representatives of the two major parties, does it not? So if the Libertarian Party became one of the two major parties, Libertarians would be able to serve, would they not? At some distant time in the future, Your Honor, that would prove true. Okay, so isn't that a level playing field that the Libertarian Party is on the same level as the Republican Party, Democratic Party, whoever finishes first and second gets slots on the Election Commission. I mean, it's level, is it not? No more so, Your Honor, than saying that African Americans are on a level playing field with whites when they are prohibited from attending schools. The argument would be, all right, we've got a law that says you're a minority race. You cannot go to school. You can become a majority race. Race is a much different deal than minority party status, which is not immutable. Yeah, I mean, the Republican Party, you know, there was a time that the parties were the Federalist Party and the Democrat Party and then the Democrat Party and the Whig Party. And then the Republicans became more prominent than the Whigs. And I mean, things change over the years. And there's nothing to say that the Libertarian Party will not become a major party. They're not prohibited from it. It's based upon the democracy, the vote. The same is true with religion, Your Honor, speaking of immutable versus mutable. One can change religions, but that doesn't change the fact that the Supreme Court is so held. A law that says a minor or new religion is treated differently, just as much violates the Constitution as a law that singles out Judaism or Catholicism. The difference is you have this sort of Elrod exception you have to deal with. Now, just as a foundational matter, I mean, it is. I mean, isn't it correct that your only practical grievance here is that your members, members of your party can't become members of this commission? And therefore, that's going to make people less excited, I guess, about joining the Libertarian Party. Am I missing something about having on you? This is one thing that what that misses is that the Ohio Elections Commission took adverse action against the Libertarian Party in this case. So we've got past harm as well as what you've described, I think, which is future harm. Both exist in this case. Yeah, but your First Amendment injury is not whatever the commission did in the past. Right. I mean, you're seeking prospective relief, if I recall. We are. And so that the harm that we're focused on in this case is prospective. And the only thing I see is, frankly, what seems to be a highly attenuated argument, that you're going to have a harder time encouraging people to join your party because they won't be able to be a member of a commission that 99 percent of Ohioans have never heard of. That's not true. That is not our only argument. There are four different ways to get to stand in our case. I'm not talking about standing. I'm talking about trying to understand the merits and why this is a big deal. Well, the injury that's necessary. I'm sorry. Go ahead. I don't know whether. Do you have any arguments relating to the nature of the decisions of the Election Commission constituted the way it is? Yes, your honor. In our particular case, the Ohio Elections Commission refused to enforce Ohio law, which bans corporate, including nonprofit contributions on a non egalitarian basis to candidates and parties. That was a huge, in my opinion, your honor, that's what cost us three percent of the vote in 2018. If we had candidates on the stage with Richard Cordray and Michael DeWine, if we had our candidate on stage, we would have won three percent of the vote. We didn't have them on stage because of the Ohio Elections Commission. That's the unlevel playing field. That's another injury that we suffered. So there are numerous injuries. There's not only the recruitment of our candidates. Well, that's the bigger harm that you're worried about. It would seem like. Sure, your honor. Yeah, that was one of them. I know that's passed, but it can be corrected. OK, I just want to understand, like, practically what worries you about this and that that answers it. So thank you. And also, your honor, we're in the midst of a very contentious election cycle now, obviously. I mean, it's not a gubernatorial election, but we still have down office candidates running. And I am not a political scientist, but political scientists I know teach have said to me, you need to build your party from up, bottom up. You need to run down ticket candidates. That's where you win. And when you begin winning those races, you can then win the top of the ticket races. Well, Mr. Brown, if if we were to adopt your argument and say that the requirement that the members of the commission be members of the two major political parties, if we said that that that requirement was unconstitutional, how would the members be appointed? I mean, right now they're appointed, I think, by the speaker of the House of the one party and the leader of the other party. How how would you how would you have us appoint the members? I don't think this court has to do that right now, your honor. All we're asking the court now is to say Ohio's current statute. Well, I mean, what's the remedy you want then? I mean, you have to it has to go somewhere. I mean, there's got to be an election commission, doesn't there? And then if we're going to throw out the scheme, what would you have us put in its place? Well, what we want is a negative injunction saying you just can't do it that way. The Ohio Election Commission does under state law have the authority to farm these cases out to prosecutors. It could have done that with our case. We just chose not to. So that would we could have the Ohio Elections Commission just farming out the relevant cases to prosecutors. Alternatively, OK, I thought I thought it was the membership of the commission that was the problem. So if we say the members membership is unconstitutional, we have to reconstitute the commission, I assume. And you don't really have a remedy there, do you? I don't think you have your honor. With all due respect, I don't think this court has the authority to reconstitute the commission. I think all this court can do to say the commission is unconstitutional. No, take no canning against National Labor Relations Board. So there just is no commission. If if you if you win, no, there would be a commission. It just could not. It would be structurally unconstitutional and it would be void. Its actions would be void. Again, if you if you look at no canning against National Labor Relations Board, that was the case where the Supreme Court invalidated President Obama's recess appointments, the National Labor Relations Board. And what the Supreme Court said was structurally the National Labor Relations Board is unconstitutional. Therefore, the mandate, what it did to no canning is void. That doesn't mean there is no longer a board. It just means that it has to be constituted in the proper fashion. And that's one of the forms of relief we're looking for your honor. We're also looking for reinstatement of the the claim that was summarily rejected by the Ohio Elections Commission, a very biased Ohio Elections Commission and resolution by a properly constituted board commission. So there are various kinds of relief that can be offered here, your honor. Well, what would what would make it constitutionally composed? I mean, would it be if the if the seventh member was had to be a member of a minor party, would that be enough? I don't think that by itself would be enough. I think what the best way to do it. Ohio, in its brief, cites a litany of federal commissions. And what they do is they have their majority or no more than restrictions. So no more than three can be Republicans. No more than three can be any political party. And that would then allow all the parties to compete equally for the position. So that'd be the easiest way to fix it. A very. And that's the most common way. Ohio's laws is almost there. I think there are a couple of agencies out there in the United States, small agencies that are like that. Indiana had the same law, common cause, Indiana case. Delaware had the exact same law. And Judge Griffin, they also use the language major party versus minor party. And those courts, the Seventh and the Third Circuit, invalidated those laws, even though they didn't speak directly to the Libertarians or the Greens or the Republicans. I'm sorry. My time is up. Further questions at this point? Judge Kethledge, Judge White. Thank you. All right. Let's let's hear from the NPL. Good afternoon. Good afternoon, Judge Griffin, Judge White, Judge Kethledge. May it please the court, my tender shot on behalf of the individual members of the Ohio Elections Commission. Your Honor, to take a step back, there is both a jurisdictional reason and a merits reason to uphold what happened in the district court. There's not Article three standing here in our view to elevate this beyond an academic dispute to a concrete dispute. And then on the merits, this court's precedent, U.S. Supreme Court precedent show there's not a First Amendment problem with Ohio choosing to structure this part of its government in a way to maintain partisan equipoise for this one corner of its state government. Now, one thing that came up in the discussion with my friend on the other side here is this problem of the non-enforcement back from the 2018 gubernatorial election. Well, as I read my friend's brief, that's not something that is raised here. That's something the district court said. There's no standing to challenge a non-prosecution decision relying on settled U.S. Supreme Court precedent. And that's not something I see in the statement of the issues or anything of that nature. As far as I know, and of course, this is not in the record at the moment, the Libertarian Party or the Libertarian candidates don't have anything pending before the Ohio Elections Commission. And it's also not on the record, but I think they have stopped their state appeal that would go up as a normal administrative appeal through the state court system that could raise an issue like that. So I think what we're here to do is to decide, the Article 3 question, does either the party or Mr. Thomas have standing to raise this claim about a partisan filter for that seventh seat on the commission? And if there is standing, despite our view on that, and does the First Amendment, does it countermand Ohio's choice to structure this one part of its government this way? So briefly on the Article 3 point, the Libertarian Party has not identified any member other than the other plaintiff, Mr. Thomas, who's willing and able to serve. I think that takes away their standing. Why isn't one enough? Well, one would be enough. I was just trying to go through the list there. So for Mr. Thomas, his standing should be measured at the time of the complaint, not by the on the eve of oral arguments evidence that has been put in here at the time of the complaint. I'm sorry? Yeah, why? Sure. I mean, I don't know. I don't think. So first of all, even if we measured at the time of the complaint, when he has some office with the Libertarian Party, he could have chosen to resign that office were he, you know, selected for the commission. So I don't really see how that's an insuperable obstacle to him being aggrieved for purposes of Article 3. Well, Your Honor, if you put on that evidence at the time of the complaint or in the hearing, then perhaps that would be enough. But that wasn't the state. And the fact of this, the filing two weeks ago showing that now he's resigned is something that comes very late. It's like what happened in Summers v. Earth Island Institute or in Lujan, U.S. Supreme Court's cases about environmental groups. But Mr. Fendershot, did you raise the issue of Thomas's lack of standing in the district court? Your Honor, it was in the answer, but it was not brief. We only raised that here. You did not raise it in the district court. You've only raised it on appeal. So how would he be expected to garner evidentiary support in the district court when he did not even know it was an issue? Well, I guess just by looking at the statute and during the hearing, going through the various things, it could be barriers. But let me, because of that, you know, I don't want to spend all the time on Article 3. Certainly we briefed that and happy to continue answering questions about it. But if we do turn to the merits, this court's precedent, especially Peterson v. Dean, we think shows the way to go about thinking about this question and the answer. So Peterson dealt with Tennessee election officials, and they were really two rungs down the hierarchy from the election officials here. And the court said, this court held in that case, that partisan criteria were fine for those election officials. Also, the body that hired them and the state body above them in Tennessee, both were comprised of only the top two voters at the ballot box in the state. So if those are okay, that makes what is going on here okay as well. But of course, it's not just Peterson. This court in McLeod detailed the way to think about this question in light of Elrod and Branty and Rutan and said, laid out, Judge Boggs' opinion laid out four categories to think about this question. And the fourth category speaks pretty closely to this case, saying that achieving partisan balance on a multi-member commission is something that the First Amendment doesn't countermand. Let's also look at what the Supreme Court has said and held, at least in a summary opinion on this issue as well. So in Branty, the court said it would be obvious, that's its word, not mine, obvious that having two election judges from the two most successful parties to judge the goings on at the polling place would not be a First Amendment problem. And despite the rest of that case, of course, being an anti-patronage decision, the court said it would be obvious to have the kind of balance that we have going on here. One other thing, one other point of reference from the Supreme Court, there was a case out of Ohio, a three-judge district court called Parinson versus the Board of Elections, and this predated Elrod and Branty, but the Supreme Court summarily affirmed, a three-judge district court, that it rejected a challenge to the Ohio Board of Elections structure, which back then as today, is again made up of four members, two from each of the most successful parties in the most recent electoral elections. So I think if you take my friend's view of what the First Amendment requires here, you don't just endanger this commission or all the boards of elections in Ohio. By my count, every state in the circuit has some body or multiple bodies that exclude the third, fourth, and fifth place vote-getting bodies until they become more successful. The Kentucky Board of Elections, the two Tennessee boards that are mentioned in Peterson versus Dean, and in Michigan, I think the state and county board of canvassers also have this feature, where it is electoral success, usually at a gubernatorial level, or I think in Kentucky, it's the Secretary of State's race, that is used to decide who will be members of this very narrow position in state government. Well, couldn't you have a vote threshold, so that you include any party that gets over a very substantial threshold? Yeah, that's certainly, I think, one model. As far as I know, Wisconsin has a model like that, where if you're not one of the top two vote-getters, but you clear 10%, that creates eligibility. But the Libertarian Party is not really even within striking distance of that 10%, so even if it was the duty of this court to put some threshold in place, I don't think it would benefit the Libertarian Party or the other minor parties that have been on the ballot from time to time in Ohio. Well, I'm really just trying to see how far this can go before it becomes a problem. I mean, if you have, if the parties are split 35, you know, if the parties are separated by percentage points, and that's what happens regularly, is it, I mean, does it make sense to have it shift around every year? I'm sorry, go ahead. I'm sorry for interrupting, Your Honor. Voting might raise interesting questions. I don't think it would change the analysis, but we're far afield from that here with, as my friend mentioned, Libertarian Party didn't even hit the 3% threshold in the last gubernatorial election, which is to achieve minor party status in Ohio. So Ohio did experiment a little bit with something that raised an issue before the 1996 reconstitution that we're dealing with here. This commission had five members, was of the two most successful parties at the ballot box, and the chair of the commission switched back and forth every time the chair stepped down, and that, the General Assembly decided that really wasn't workable to have that constant back and forth, and they really wanted to create this equipoise dealing with these sensitive issues of campaigning. And it makes it like, although not identical, because they wanted to have a tie-breaking vote, but it makes it like the Ohio Boards of Elections, makes it like the Kentucky Board of Elections that is evenly split, and others that I mentioned within Michigan and Tennessee that have this balance and don't have a spot for a minor party. It is the ballot box that determines the membership, and that is true of, like I say, some laws in all of these states. It was true of the structure that the Supreme Court summarily affirmed. Yeah, let me, if I may ask a question, this commission decides which parties or which candidates get to participate in debates, is that correct? Well, it isn't something that's set aside as one of its duties. That was a complaint that the Libertarian Party brought. People can be complainants, they can be rival campaigns, they can be third parties. That was a complaint they brought to the full commission leading up to the 2018 gubernatorial debate. So what comes before them, they certainly have in statute the sorts of laws they're dealing with, like campaign contributions, and I guess it's up to the creativity of litigants as to what actually comes before them, but something like that, debate participation is not specifically in a statute. And I mean, there would be a potential danger, generally, that if the composition of a commission that in some manner regulates election kind of activity were limited to the two major parties, that they could use that power to exclude parties like the Libertarian Party to keep them down and not allow them to become significant competitors. And if they're, you know, keeping the libertarians off the debate stage, yeah, it's, it's, it's, it is a, there's a bit of tension between on the one hand, keeping them off the debate stage, and on the other hand, saying, your honors, they don't matter because they didn't get. I guess, I mean, do you have any response, Mr. Hendershot to that concern about the ability of the two major parties to exploit this power in a way that would just perpetuate their own oligopoly. Sure, your honor, sorry, I was just waiting for the church bells there or something like that. So, number one, I think the most important point is that sort of keeping third, fourth and fifth parties down is not really something that the commission has very much of a role in. I mean, ballot access, primaries, all the sorts of things, as my friend mentioned, down ticket races, all of that stuff is not in the realm of the commission. There have been many other lawsuits about these topics, the thresholds to get on the ballot, the thresholds for holding a primary. These are things that are outside whether you have one libertarian out of seven, or one Green Party member out of seven on this commission. And so, I think in terms of building up the party, it has a very minor role to play here. And the second point I would make is that in a particular case, whether it's the debate complaint that started this lawsuit and had a state court administrative appeal attached to it, those kind of things, particular harm from a particular decision, are things that should be litigated coming out of that decision. And this is not something that is in our brief, it just calls to mind a case the U.S. Supreme Court decided about the Texas optometry board. There, an optometrist was complaining about the makeup of that board, and the court said, well, any bias that you think may have happened in this board really should be litigated in the context of an actual challenge to a decision of that board, but instead of, the optometrist complaint there reminds me of this one here, that it's just a complaint about the structure of the board overall, and that's kind of in a different category. So those, just to summarize that point, Your Honor, the main things that would link to libertarian party success are not things that come before the commission, and particular decisions that maybe do have some kind of relation to that can be litigated in those particular matters when they happened. Is major political party defined in the statute? It's defined overall in Ohio's election statute, and it's generally a 20% threshold, and then the minor party is a 3% threshold, and those are measured by both gubernatorial and presidential election cycles. So there's an every two year, if I have that straight, every two year opportunity for a party, it can get on the ballot through other mechanisms like petitions and so forth, and then if it garners that 3%, becomes a minor party, I believe it's a 20% threshold that makes it a major party. And since that structure has been in place, like in many states, there's been Republican and Democrat that have cleared the major party threshold, and then around the country you see there are thresholds like this in many states, other parties, the Green Party, Libertarian Party, and others have cleared the... What happens under the statute if there are three parties that clear 20%? So, Your Honor, the 20% threshold is just for defining major political party. For membership on this commission, just like on the statutes I mentioned from other states and Ohio's boards of elections, it's still the top two vote getters. So that does link back to your question, what happens if a third place vote getter is within striking distance? We don't have that situation here, but it still is the top two vote getters. And that's a common filter that you see, I think, like on the Kentucky Board of Elections, the Ohio Board of Elections at the county level, at least, in this commission. Just to be clear, that definition is something that touches on more than just this commission. This commission, the threshold to get the six seats that are not the one that's unaffiliated are related to the top two vote getting parties, because that leads to the speakership and then the next, so the next most popular party. And then, in terms of disqualifying a representative of a minor party for the last seat, did you want to say anything about that? Your Honor, yeah, I'll use that as a segue to wrap up. And so, not being qualified for that seat is something that I think is addressed by, at least, not the holding, but the statements in this court's McLeod decision, the holding in Peterson v. Dean, what the U.S. Supreme Court said in Branty, which is, it's obvious you could have a one-and-one split for election judges, and the Supreme Court summary affirmance in the pre-Elrod case of Parinson, which dealt with an Ohio Board of Elections 2-2 split. Again, no room for anything other than the top two vote-getting parties. Your Honors, if you conclude this Article III jurisdiction, we would ask that you affirm what the district court did here. Thank you. All right, any further questions? No, sir. All right, Mr. Brown, you've got three minutes to rebuttal. Thank you, Your Honor. In response to Judge White's question, Mr., I'm sorry, the SG, said that it's very common to have this kind of law. That's just not correct, Your Honor. Ohio's law is extremely uncommon. You won't find it almost anywhere in the country. Ohio has not cited any law like this in its brief. The law is not common at all. Instead, what most states do is they have bare majority or no more than laws. Very few, if any, states that I'm aware of absolutely ban minor party members from serving on agencies, courts, or on quasi-adjudicative boards. Those laws are so uncommon, I can't even think of one, and none of them are cited in the brief. Ohio's law is an outlier, and therefore, if this court were, I think, to correctly rule, it violates the First Amendment. That ruling would have very limited effect anywhere else in the country. There are only a couple of laws like Ohio's. One was in Delaware, where Delaware did exactly the same thing Ohio does to its courts. The other was in Indiana, where Indiana did the same thing, at least in the Marion County courts, where it said you've got to be pretty much major party in order to get elected. Mr. Brown, I'm familiar with Peterson v. Dean, and that's a Tennessee case. Yes, Your Honor. And that concerned county election commissions, and it's my understanding that the county election commissions were four members of the majority party and three members of the minority party. But isn't that pretty much what we have here? And that's Tennessee. There are a couple of states. In fact, if you look. And in Peterson v. Dean, both my majority opinion and Judge Clay's dissent, we both applied Elrod, and we both concluded that the members of the Tennessee Election Commission were Category 4 employees or Category 4 appointees. And therefore, the First Amendment challenge did not survive. How do you argue against that? Well, the Peterson case dealt with dismissals, Your Honor, and not appointments in the first instance. Well, it involved the administrator of the election that was appointed by the election commission. But we concluded the election commission, which was made up of the majority and minority party, were Category 4. And, I mean, isn't that what they're arguing here? Sure they are, Your Honor. But the problem is Category 4 relates to the so-called political exception. So the Supreme Court in Elrod and in Branty said, well, there are some offices where you can use political party status. But the court in Elrod and Branty also made it clear that those were not categorical bans. What that exception does is it gives the appointing officer discretion. The odd thing about Ohio's law, Your Honor, is let's say we had, and this ties back into Judge White's question, let's say we had three major parties. Party C wins the gubernatorial election. Party A and B are otherwise the two major parties. What Ohio law does is it prohibits the governor who appoints these officials, Party C, it prohibits him from appointing members of his own party. It steals discretion away from him. It is absolutely the worst. I'm sorry, my time is up, Your Honor. May I ask you a question? Oh, please finish. It is absolutely the worst kind of usage of political party status. Because it does, it takes discretion away from the appointing officer. I apologize for running over my time, Your Honor. Thank you very much. Are there any other questions? Any further questions? No. All right. We'll take the case under advisement, and you may adjourn the court.